Mr. Justice GRIER
 

 delivered tbe opinion of tbe court.
 

 This case originated before tbe commissioners for ascertaining and settling private land claims in California..
 

 Domingo and Vicente Peralta claimed as grantees and dev--isees of their father, Luis Peralta.
 

 Tbe documentary evidence filed in support of tbe claim consists of a true copy from tbe archives in tbe office of tbe surveyor general of California, containing, so far as they are material in tbe present inquiry, tbe following averments :
 

 1. Tbe petition of Luis Peralta to tbe Governor for a grant of. land, extending from tbe creek of San Leandro to a small mountain adjoining tbe sea beach, at the distance of four or five leagues, for tbe purpose of establishing a rancho, dated June 20, 1820.
 

 2. The decree of . Governor Sola, therein directing Captain Luis Antonio Arguello to appoint an officer to place tbe petitioner in possession of tbe lands petitioned for, dated August 3, 1820.
 

 3. Order of Captain' Arguello, dated August 10, 1820, detailing Lieut. Don Ignacio Martinez for that purpose.
 

 4. The relinquishment of Eatber bTareiso Duran, on behalf of tbe mission of San José, of any claim to tbe .land, and reserving tbe privilege of cutting wood on tbe same, which, be says, should remain in common, dated August 16, 1820.
 

 5. Under tbe same date, tbe return of Lieut. Martinez, upon tbe order to, give the possession, describing tbe boundaries, &c.
 

 6: Tbe decree of the Governor, directing a portion of tbe lands assigned to Luis Peralta, by tbe foregoing act of possession, to be withdrawn, upon the reclamation of the mission of San Francisco, who claimed that tbe Baid portion of tbe lands was then in the occupancy of the mission as a sheep ranch.
 

 7; The consent of Father Juan Cabot and Paloz Ordez, ministers of tbe mission, that the boundaries of the land solicited by Luis Peralta should be established at tbe rivulet, at tbe distance of three and a half to four leagues from tbe rancbo-bouse .of tbe mission.
 

 8. Tbe return of Maximo Mai’tinez upon Governor Sola’s second decree for tbe delivery of possession, filing tbe boundaries in accordance with tbe claim of tbe mission, at a rivulet which runs down from tbe mountains to tbe beach, where there is a grove of willows, and about a league and a half from tbe cerito (little mountain) of San Antonio, in tbe . direction of San Leandro.
 

 
 *346
 
 9. A document dated October, 1822, and signed Sola, setting out, that on that day was issued in favor of Sergeant Luis Pe-ralta, by the Governor of the province, the certifying document for the land which has been granted him, as appears by the writ of possession which was given him by the lieutenant of his company, Don Ignacio Martinez, in conformity with the orders of the Government.
 

 10. A letter from Luis Peralta, protesting against the claim of the mission, dated October 14th, 1820.
 

 11. A representation from Captain Don Luis Arguello to the Governor, dated June 28, 1821, advocating the rights of Sergeant Peralta, in opposition to those of the mission, to the land in controversy; and, lastly, the description of the land returned by Luis Peralta, in obedience to the Government, of the 7th of October, 1827.
 

 The claimants gave in evidence, also, the original grant from Gdvernor Sola to Luis Peralta, dated 18th of August, 1822; the petition of Luis Peralta to Governor Arguello, prayingthe restitution of the lands which had been taken from him on the demand* of the mission; and the decree of Arguello, making such restitution, and directing him to be again put in possession by the same officer who had executed the former act of possession. To this order, Maximo Martinez made a return, duly executed, certifying that the grantee had been newly put in possession of the. place called “ Cerito de St. Antonio, and the rivulet which crosses the place, , to the coast, where is a rock looking to the north.”
 

 It was further shown, from the public records, that on the 9th of April, 1822, the civil and military authorities of California formally recognised and gave in their adhesion to the new Government of Mexico, according to .the plan of Iguala and treaty of Cordova. Also, that in 1844, Ignacio Peralta, one of the heirs of Luis Peralta, petitioned the Government for a new title to the land claimed, in consequence of the original title-papers having been lost or mislaid. The archives show, also, that on the 13th of February, 1844, an order was made by Micheltorena, that a title be issued. Of the same date, there is the usual formal document “ declaring Don-Luis Peralta owner in fee of said land, which is bounded as follows: .
 

 “ On the southeast by the creek of San Leandro; on the northwest by the creek of
 
 Los Ceritos de San Antonio,
 
 (the small hills of San Antonio;) on the southwest by the séa; and on the northeast by the tops of hills range, without prohibiting the inhabitants • of Contra Costa from cutting wood for their own use, they not to sell the same.” This' document contains an order that “this espediente be transmitted to the depart
 
 *347
 
 mental assembly for tbeir approval,” but nothing further appears to have been dóne, nor is the signature of Micheltorena attached to the record.
 

 The authenticity of these documents is admitted. The objections urged against their sufficiency to establish the claim are: first, that the officers had no power to make grants of land; and, second, that the northern boundary of the land described does, not extend beyond a certain creek or stream, known by the name of San Antonio. This would exclude about one half of the claim.
 

 ¥e are of opinion that neither of these objections is supported by the evidence in the case.
 

 "We have frequently decided that “the public acts,of public officers, purporting to be exercised in an official capacity, and by public authority, shall not be presumed to be usurped, but that a legitimate authority had been previously given or subsequently ratified.” To adopt a contrary rule would lead to infinite confusion and uncertainty of titles. The presumption arising from the grant itself makes it
 
 prima fade
 
 evidence of the power of the officer making it, and throws the burden of proof on the party denying it. The general powers of the Governors and other Spanish officers to grant lands Within the colonies' in full property, and without restriction as to quantity, and in reward for important services, were fully considered by this court in the case of United States
 
 v.
 
 Clarke, (8 Peters, 436.)
 

 The appellants, on whom the burden of proof is cast, to show want of authority, have produced no evidence, either documentary or historical, that the Spanish officers who usually aqted as Governors of the distant provinces of California were restricted in their powers, and could not make grants of land. The necessity for the exercise of such a power by the Governors, if the Crown desired these distant provinces to be settled, is the greater, because of their distance from the source of power. By the royal order of August 22, 1776, the northern and northwestern provinces of Mexico were formed into a new and.distinct organization, called the Internal,Provinces of hTew Spain. This organization included California. It conferred ample powers, civil, military, and political, on the Commandant General. ' The archives of the former Government also show, that as early as 1786, the Governors of California,had authority from the Commandant General to make grants, limiting the number of sitios which should be granted. In 1792, California was annexed, to the vieeroyalty of Mexico, and so continued till the Spanish authority ceased. An attempt to trace the obscure history of the various decrees, orders, and regulations of
 
 *348
 
 the Spanish Government on this subject, would he tedious and unprofitable. It is sufficient for the case, that the archives of v the Mexican Government show that such power has been exercised by the Governors under Spain, and continued to be so exercised under Mexico; and that such grants, made by the Spanish officers, have been confirmed and held valid by the Mexican authorities. Sola styles himself political and military Governor of California. He continued to exercise the. same powers after his adhesion to the Mexican Government, under . the provisions of the plan of Iguala, and the twelfth section of the treaty of Cordova. The. grant in fee,' given by Sola, was nfter the revolution.
 

 The Government of Mexico, since that time, has always respected and confirmed such concessions, when any equitable or inchoate right, followed by possession and cultivation, had been conferred, by the Governors under Spain. • The case of Arguello, (18 How., 540) was that of a permit by Governor Sola, afterwards confirmed, by the Mexican Government and by this court. The plaintiff in error has not been able to produce anything from historical documents or the archives of California, tending to show a want of power in the respective officers in this case. On the contrary, the presumption of law is confirmed by both. The order of Micheltorena, in 1844, for the granting the new title to Peralta, is itself evidence of the usage and custom, and that the acts of Sola and Arguello were considered valid, and that the title, whether equitable or'legal, conferred to them, should be respected and confirmed .by the Government.
 

 As the validity of the petitioner’s title has been assailed on the ground of want of authority alone, it is unnecessary to notice more particularly the various documents exhibited in support of it. The grant by Sola of a' portion of the tract of which Peralta had been originally put in possession, is a complete grant in fee for that portion. The restoration by Ar-guello of the original boundaries, by decree and act of the public officer, inay not have the character of a complete grant; but it is of little importance to the decision of the case, whether -it conferred only an inchoate or equitable title, connected with an undisputed possession of thirty years, and confirmed again in 1844, by the order of the Governor of California; its claim for protection under the treaty with Mexico cannot be doubted, notwithstanding its want of. confirmation by the departmental assembly.
 

 The only remaining question is the position of the northern boundary line.
 

 Peralta’s, original petition, in June, 1820, described the land
 
 *349
 
 desired, as beginning at a creek called San Leandro, “and from this to a white hill, adjoining the sea beach, in the same direction, and along the coast four or five leagues.”
 

 The return of Ignacio Martinez, the officer who executed the order for delivery of possession on the 16th of August, 1820, describes “the boundaries which separate the land of Peralta, to be marked out as follows: The deep creek called San Leandro, and at a distance from this, (say five leagues,) there-are two small mountains, (cerritos;) the first is close to the beach; next to it follows the San Antonio, serving as boundaries, the rivulet which issues from the mountain range, and funs along the foot of said cerrito of San Antonio, and at the entrance of a little gulch there is a rock elevating itself in the form of a monument, and looking towards the north.” This is the description of the northern boundary. It refers to stable monuments — two hills, a rivulet passing at their foot, and a monumental rock. In other documents, Peralta speaks of this line “as the dividing boundary with my neighbor, Francisco Castro.” Again, in the return of Ignacio Martinez to the order of the Governor, Arguello, in 1823, to redéliver the possession to Peralta, up to his original boundary, he describes this within boundary by the same monument, “the cerrito San Antonio, the arroyito or rivulet which crosses the place to the coast, where is a rock looking to the north.”
 

 Lastly, the title of confirmation by Mieheltorena in 1844, as quoted above, though not in the very words of the above documents, clearly desmbes the same monuments. These hills, rivulet, and rock, are well-known monuments, and their position is satisfactorily proved.
 

 The testimony of the opinions of witnesses who have but lately arrived in the .country, who are ignorant of the language and traditions of the neighborhood, ana who are all interested in defeating the claim of the petitioners, can have little weight against the knowledge of others who were present when the lines were established, some thirty years ago, and have known these boundaries till the present time.
 

 The decree of the Circuit Court is therefore affirmed.
 

 Mr. Justice DAJSlEL dissented.